**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| RAM HEAD OUTFITTERS, LTD., a Canadian company, | CV 09-1382-PHX-MHM |
| Plaintiff, | **FINDINGS OF FACT & CONCLUSIONS OF LAW** |
| vs. | |
| GERALD WILSON MECHAM, JR., and JANE DOE MECHAM, husband and wife; ROBERT C. MACE, individually and d/b/a/ Mace Aviation, and JANE DOE MACE, husband and wife; and JAMES PENDERGRAST, and JANE DOE PENDERGRAST, | |
| Defendants. | |

This case went to a bench trial on November 17, 2010, and lasted four trial days. Plaintiff Ram Head was represented by Doug C. Northup and Kristin Ann Paiva of Fennemore Craig PC, and Defendants Gerald Mecham and Robert Mace were represented by Edward A. McConwell of the McConwell Law Offices. Ram Head has brought five causes of action against Mecham—breach of contract, breach of implied warranty of fitness, breach of implied warranty of merchantability, negligent misrepresentation, and consumer fraud—claims against Mace: breach of contract, negligent misrepresentation, and professional negligence. After considering the evidence and testimony presented, and having reviewed the parties' revised proposed findings of fact and conclusions of law, the Court

1   issues the following order.

2   **I.      FINDINGS OF FACT**

3   1.      Stan Simpson is the principal of Plaintiff Ram Head Outfitters, Ltd. ("Ram Head"),

4           an outfitting business which takes clients hunting and fishing in remote areas of the

5           Canadian wilderness.

6   2.      Ram Head uses airplanes to gain access to these areas of remote Canadian wilderness.

7   3.      Ram Head's operation requires its pilots to take off and land on rough terrain—such

8           as a gravel bars or mountainsides—which is a very challenging type of flying.

9   4.      Defendant Robert Mecham, Jr. is a resident of Arizona and a retired farmer.

10  5.      Prior to becoming a farmer, Mecham owned a crop dusting company and worked as

11          a crop duster, performing crop dusting services for 18 seasons, from approximately

12          1977 to 1994.

13  6.      Generally, crop dusting requires pilots to perform multiple takeoffs and landings per

14          hour, often times on rough terrain. Crop dusting is generally more dangerous than

15          flying an airplane under normal conditions.

16  7.      As part of the crop dusting business and while crop dusting, Mecham regularly flew

17          planes similar to the plane at issue in this litigation, a Cesna A185E.

18  8.      During the time Mecham owned his crop dusting business, the company owned

19          between 10 or 12 airplanes, but usually owned no more than four or five airplanes in

20          any given year.

21  9.      Over the course of approximately twenty-five years, Mecham has owned and sold

22          approximately ten to fifteen planes.  These airplanes were purchased and sold in

23          connection with his crop dusting business and for his individual use.

24  10.     In approximately December 2005 or January 2006, Mecham purchased and acquired

25          a Cessna A185E, serial number 18501301 (the "Plane"), through a broker in

26          California for $119,880.

27  11.     The Plane had been in a 1993 accident, but had been returned to service.  The Plane

28          had passed two annual inspections since Mecham became its owner, one in 2006, and

1    one in early 2008.

2    12.    Before deciding to put it up for sale, Mecham had owned the Plane for approximately
3            27 months and flown it for approximately 20 hours.

4    13.    On March 13, 2008, Mecham advertised the Plane as for sale in Trader-a-Plane, a
5            national advertising media for aircraft.  The advertisement stated that the Plane was
6            a "fast, clean" airplane.

7    14.    Simpson saw the advertisement online on March 13, 2008, and contacted Mecham
8            about the plane that same day.

9    15.    Simpson was interested in purchasing the Plane because a landing gear failure had
10           caused substantial damage to his own Cessna 185, and he wanted to replace that
11           aircraft.

12    16.   Simpson and Mecham had at least two phone conversations about the Plane.  During
13           these conversations, Mecham told Simpson the Plane was fast and clean, that it was
14           located at Falcon Field, had a fresh annual inspection, and had been involved in a
15           1993 wreck.  Simpson explained to Mecham that he sought a plane for his use in his
16           outfitting operation.

17    17.   On Saturday, March 22, 2008, Simpson visited Mecham's hanger in Mesa, Arizona,
18           to view the Plane.

19    18.   During the March 22, 2008 visit, Simpson made clear to Mecham how Ram Head
20           intended to use the plane.  Simpson showed Mecham a Ram Head brochure, and
21           explained to Mecham the outfitting business and the type of flying required thereby,
22           including the necessity to making rough landings in inhospitable terrain.

23    19.   Also during the March 22, 2008 visit, Mecham told Simpson that he was formerly a
24           crop duster and had owned and operated his own crop dusting business. Defendant
25           Mecham and Simpson discussed the similarities between the flying required for crop
26           dusting and for Ram Heads outfitting operation, both of which require making pilots
27           to make landings in rough terrain.

28    20.   During their conversation on March 22, 2008,, Mecham told Simpson that the Plane

1  was clean, fast, and in good condition.

2 21. As a result of their March 22, 2008, conversations, Mecham knew that Ram Head's

3  purpose in purchasing the Plane was for use in its Canadian outfitting business and

4  understood the type of flying that entailed.

5 22. During Simpson's March 22, 2008 visit, Mecham gave Simpson the opportunity to

6  inspect the Plane's logbooks, and other records.

7 23. After Simpson looked at the Plane's records, Mecham and Simpson pulled the Plane

8  out of the hanger and took it for a short flight. Mecham took off and landed the Plane,

9  and Simpson flew the Plane for a period of time to get a feel for how it handled.

10 24. Following the short flight,  Simpson expressed to Mecham an interest in purchasing

11  the Plane, but explained that he wished to have the Plane inspected first.   Simpson

12  asked Mecham if there was anyone at the airport who could perform an inspection and

13  differential compression test of the plane's engine.   Mecham suggested two

14  possibilities, Falcon Executive Aviation and Mace Aviation; Simpson decided to take

15  the plane to Mace Aviation, which is owned by Defendant Bob Mace.  Simpson was

16  aware that Mace Aviation had previously worked on the Plane.

17 25. Upon arriving at Mace Aviation, Simpson asked Mace to conduct both a pre-purchase

18  inspection of the Plane and a compression test on its engine.  Mace stated that he was

19  too busy to perform an inspection that day, but had enough time to perform the engine

20  compression check.  Shortly thereafter, Mace Aviation performed the compression

21  test, which the Plane passed.

22 26. Following the compression test, which ended around 11:30 AM, Simpson visually

23  inspected the airplane for approximately an hour, during which time he communicated

24  by phone with his mechanic in Canada, who gave Simpson advice about what

25  Simpson should have inspected or examined on the Plane before agreeing to its

26  purchase.

27 27. Before leaving Mace Aviation on March 22, 2008, Simpson explained to Mace that

28  he wanted to ensure the Plane's safety before agreeing to its purchase, and asked

1    Mace if he could conduct the pre-purchase inspection over the weekend, to which

2    Mace agreed.

3    28.   For the pre-purchase inspection, Simpson asked Mace to perform the following tasks:

4          make sure that the Plane's log books, records, and other documentation were in order,

5          and that the Plane complied with all Airworthiness Directives ("AD").  Simpson did

6          not ask Mace to perform a pre-purchase annual-type or 100 hour inspection of the

7          Plane.

8    29.   Mace did not conduct the agreed upon pre-purchase inspection.

9    30.   On Saturday, March 22, in exchange for Mecham's promise not to sell the Plane over

10         the weekend, Simpson provided Mecham with a personal-check deposit in the amount

11         of $1000.00.  The Plane was left at Mace Aviation for the weekend.

12   31.   On the morning of Monday, March 24, Simpson returned to Mace Aviation and found

13         the Plane with its cowling off and inspection Plates open.   Simpson spent

14         approximately three hours alternatively speaking with Mace and inspecting the Plane.

15         Mace informed Simpson that all of the Plane's paperwork was in order and that the

16         Plane was in good shape.

17   32.   At approximately noon, on Monday, March 24, 2008, Mecham arrived at Defendant

18         Mace's mechanic shop. Shortly following his arrival, Mecham and Simpson went to

19         lunch, at which time Simpson, on behalf of Ram Head, agreed to purchase the Plane

20         from Mecham for $117,500.00.

21   33.   On Monday, March 31, 2008, the parties executed a bill of sale for the Plane, which

22         memorialized the wire transfer of $117,500 from Simpson and stated that Simpson

23         took the Plane free and clear of all liens.  There was no "as is" or other warranty

24         defeating clause in the bill of sale.

25   34.   After agreeing to purchase the Plane, Simpson hired Mace to do some work on the

26         Plane.  Specifically, Simpson asked Mace to remove the landing gear assembly and

27         have it x-rayed and to inspect and conduct a propeller overhaul.  He also asked Mace

28         to install a P-Ponk kit, a Sportsman STOL kit, and vortex generators; all of which

1    Simpson said he needed for the short and rough field landings Ram Head's business

2    required.

3  35.    In mid-April, 2008, Simpson requested that Mace procure and have issued a valid

4    Export Certificate of Airworthiness ("Export C of A") for the Plane. Mace agreed to

5    secure the Export C of A.

6  36.    The Plane remained at Mace Aviation for almost two months. During those two

7    months, Mace Aviation installed the requested after-market upgrades, conducted the

8    requested inspections, and made a number of minor repairs, including a propeller

9    overhaul, gas cap replacement, spark plug replacement, and battery box cleaning.

10    Mace Aviation also inspected the landing gear and overhauled the propellor.

11  37.    Simpson took possession of the Plane on May 27, 2008.

12  38.    Pursuant to 14 CFR 21.329, before an Export C of A can issue, a plane must first

13    undergo and successfully pass an annual type inspection. This inspection must be

14    performed and properly documented within 30 days before the date of the application

15    for the C of A.

16  39.    Although Mace represented to FAA Designated Airworthiness Representative

17    ("DAR"), James Pendergast, that he had conducted an annual-type inspection, Mace

18    did not perform a complete annual inspection of the Plane.

19  40.    On May 24, 2008, the FAA DAR issued Export Certificate of Airworthiness E430020

20    for the Plane. The Plane was de-registered in the United States on May 6, 2008.

21  41.    On Tuesday, May 27, 2008, Simpson took possession of the Plane. That day, he flew

22    the Plane from Mesa, Arizona to Page, Arizona and then to Richfield, Utah. On

23    Wednesday, May 28, 2008, Simpson left Richfield, Utah and flew the Plane to

24    Rexburg, Idaho, then to Helena, Montana, then to Lethbridge, Alberta. On Monday,

25    June 2, 2008, Mr. Simpson flew the Plane to Edmonton, Alberta.

26  42.    Upon arriving in Edmonton, Alberta, the Plane underwent an importation inspection

27    by a Canadian Minister of Transit inspector, Patrick Parsonage.

28  43.    During the importation inspection, Parsonage determined that the Export Certificate

of Airworthiness was not valid, as the aircraft was not in an airworthy condition due to numerous, serious defects.  For instance, the main landing gear box, horizontal stabilizer, door posts, cabin floor and outboard fittings all required significant structural repairs. Additionally, the belly skin under and adjacent to the battery box had been corroded by battery acid, the Plane had several cracked brackets and torque tubes and countless loose rivets and oversized rivet holes. The Plane also had a number of undocumented and improper previous repairs.

44. The defects discovered by Parsonage rendered the Plane unsafe for flight, i.e. not airworthy.

45. The plane was repaired and made air worthy, at Ram Head's expense, by Edmonton Flying Club and Arado Aero.

46. Because the Plane required extensive repairs, Ram Head was unable to use the Plane for its 2008 hunting season. Consequently, Ram Head leased another plane at its own expense.

## II. CONCLUSIONS OF LAW

### A. Claims Sounding in Contract

#### 1. Warranty Claims Against Mecham

##### i. Implied warranty of fitness for a particular purpose

Ram Head claims that Mecham breach the implied warranty of fitness for a particular purpose by selling him a Plane that was not suited for Ram Head's purposes.  The implied warranty of fitness for a particular purpose is provided for by Arizona statute:

> Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish goods, there is unless excluded or modified under section 47-2316 an implied warranty that the goods shall be fit for such purpose.

A.R.S. § 47-2315.  It applies equally to used and new goods.  See Singleton v. Dunn, 71 Ariz. 150, 153, 224 P.2d 643, 645 (1950) (considering application of implied warranties to used drilling equipment).  Accordingly, to prevail on his claim under § 47-2315, Plaintiff must prove: (1) Mecham had reason to know the particular purpose for which Plaintiff

required the Plane; (2) Plaintiff relied on Mecham's skill or judgment to select or furnish the airplane; and (3) lack of exclusion or modification of the warranty pursuant to § 47-2316.

### a. Mecham had reason to know of the particular purpose for which Ram Head required the Plane.

During their initial phone conversations about the Plane, Simpson explained to Simpson the nature of his business and the purpose for which he wished to purchase the Plane. When he visited Mecham to view the Plane, Simpson made even clearer to Mecham that Ram Head intended to use the Plane as part of its outfitting business, showing Mecham a brochure that described the business and explaining to him the type of flying this usage entailed. In turn, Mecham demonstrated his understanding of Ram Head's purpose by equating the type of flying required in crop dusting with the flying required by Ram Head's outfitting operation. The Court finds, therefore, that Mecham knew Ram Head intended to use the Plane to fly customers into remote areas of the Canadian wilderness and that so doing would require rough landings on inhospitable terrain. Accordingly, Ram Head has proven that Mecham knew of the particular purpose for which Ram Head required the airplane.

### b. Simpson relied on Mr. Mecham's skill or judgment to select the Plane

This element incorporates two distinct sub-elements. Before considering the issue of reliance, the Court must first determine whether Mecham possessed skill and judgment on which Ram Could rely.   See Donald v. City Nat'l Bank, 295 Ala. 320, 325 (Ala. 1976) (suggesting that a plaintiff buyer must first prove that the defendant seller possessed skill or judgment upon which the buyer could rely). The record shows that Mecham is very familiar with airplanes of the type he sold to Ram Head, having owned and operated such planes, both for business and pleasure, for over thirty years. In addition, due to his time as a crop duster, Mecham possesses specific experience and expertise concerning the type of dangerous and unconventional flying demanded by Ram Head's outfitting business. Consequently, the Court finds that Simpson possessed skill and judgment on which Simpson could have relied.

The Court addresses reliance next. At the outset it must reject any suggestion a finding of reliance is precluded  because Simpson knew that a Cesna 185 could meet Ram

1  Head's needs due to Ram Head's previous use of a Cesna 185 as part of its business.  A

2  buyer may rely on a seller's judgment even though the buyer selected the object to be

3  purchased.  See, e.g., Whitehouse v. Lange, 910 P.2d 801, 806 (Idaho App. 1996) ("The trial

4  court was correct in recognizing that buyers may rely upon a seller to furnish goods suitable

5  for a particular purpose even though the - individual unit purchased is selected by the buyer."

6  (internal quotations omitted)).   In Whitehouse v. Lange, for example, the buyer purchased

7  a mare to use for breeding, but the mare turned out to be sterile  Id.  The seller argued that

8  the buyer could not have relied on the seller's skill and judgment because the buyer had

9  selected the mare he wished to purchase based on bloodline considerations.  Id. The court

10 rejected this argument.  Id.  It explained, that despite the buyer's interest in a horse that

11 possessed the general characteristics of the horse it ultimately purchased, the buyer could,

12 and did, rely on the seller with respect to the ability of the specific horse in question to carry

13 out the buyer's intended purpose, i.e. reproduce.  Id.  The same scenario is at play in this

14 case.  Although Simpson was interested in Mecham's Plane because he knew a Cesna 185

15 could suit Ram Head's purpose, it did not preclude him from relying on Mecham's

16 assurances that this Cesna 185 would suit its intended purpose. Simpson testified that

17 Mecham's familiarity with the rigors of the flying required by the outfitting business caused

18 him to have confidence that the Plane would in fact be suitable for Ram Head's operation.

19 As a result, the Court finds that Simpson relied on Mecham's skill and judgment in deciding

20 to purchase the Plane.

21                          **c.      There was no modification of the warranties pursuant**
                                **to § 47-2316.**
22

23         A.R.S. § 47-2316 covers exclusions or modification of warranties. "[T]o exclude or

24 modify the implied warranty of merchantability or any part of it the language must mention

25 merchantability and in case of a writing must be conspicuous, and to exclude or modify any

26 implied warranty of fitness the exclusion must be by a writing and conspicuous."  A.R.S. §

27 47-2316(B). No evidence adduced at trial demonstrates that the Parties excluded or modified

28 the implied warranty of fitness for a particular purpose.  The Bill of Sale contains no "as is"

1    or other such clause, and there is no evidence, either written or oral, of waiver. See A.R.S.

2    § 47-2316(C)(1) ("Unless the circumstances indicate otherwise, all implied warranties are

3    excluded by expressions like 'as is', 'with all faults' or other language which in common

4    understanding calls the buyer's attention to the exclusion of warranties and makes plain that

5    there is no implied warranty").

6          Ram Head's ability to recover under an implied warranty is also not impeded by §

7    47-2316(C)(2), which states, "When the buyer before entering into the contract has examined

8    the goods or the sample or model as fully as he desired or has refused to examine the goods

9    there is no implied warranty with regard to defects which an examination ought in the

10   circumstances to have revealed to him."   Before contracting with Mecham, Simpson

11   attempted to have the Plane inspected, and there is no indication the requested inspection was

12   less than what Simpson desired.  This is not a case, therefore, in which the seller refused to

13   allow inspection or the buyer refused to examine the goods.  Despite the fact Simpson was

14   allowed to have the Plane inspected, section 47-2316(C)(2) does not destroy the application

15   of this warranty.   The Arizona Supreme Court has explained that the rule of caveat emptor

16   ("let the buyer beware") "does not usually operate to preclude the implication of a warranty

17   of some character, either of fitness, condition, merchantability or description from sales of

18   personalty, especially where there was no opportunity for an efficient inspection, or *where

19   the buyer relied upon the skill and judgment of the seller.*"   Singleton, 71 Ariz. at 155

20   (emphasis in original).  In electing to purchase the Plane, Simpson relied on Mecham's skill

21   and judgment concerning both the condition of the Plane and the Plane's suitability for its

22   intended purpose.  Also counseling against precluding recovery on an implied warranty

23   theory is Mace's failure to preform a pre- purchase inspection of the Plane, which prevented

24   Simpson from appreciating and perceiving the defects in the Plane, preserving the application

25   of any implied warranties.   See Saunders v. Cowl, 201 Minn. 574, 578 (1937) ("The buyer

26   may rely on the affirmation of the seller rather than his own inspection where, as here, the

27   inspection fails to reveal to him defects, either because of their being latent and concealed

28   *or because of the buyer's inability to perceive and appreciate the defects from such*

1 *inspection.*" (emphasis added)).   The Court finds for the Plaintiff as to the implied warranty
2 of fitness for a particular purpose and is entitled to damages.

3                                **ii.      Implied warranty of merchantability**

4             Ram Head alleges that Mecham violated the implied warrant of merchantability,
5 which is codified at A.R.S. § 47-2314(A) and provides that, "[u]nless excluded or modified,
6 a warranty that the goods shall be merchantable is implied in a contract for their sale if the
7 seller is a merchant with respect to goods of that kind." To be "merchantable," goods "must
8 be at least such as … are fit for the ordinary purposes for which such goods are sold." A.R.S.
9 § 47-2314(B)(3).  Accordingly, to make out a claim under this implied warranty, Ram Head
10 must have proven at trial that: (1) Mecham is a merchant; and (2) the Plane was not fit for
11 the ordinary purpose for which it was sold.  Ram Head has very clearly met its burden as to
12 the second element. When it reached Canada, Parsonage found that the Plane had numerous
13 dangerous defects and as a result was not airworthy.  Accordingly, the Plane was not suitable
14 for the ordinary use for which planes are sold; air flight.  Consequently, this claim turns on
15 whether Mecham is a merchant under the statute.

16                                **a.      Mecham is a merchant**

17             A.R.S. § 47-2104 defines a "merchant" as "a person who deals in goods of the kind
18 or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the
19 practices or goods involved in the transaction[.]" (emphasis added).  Mecham does not
20 qualify as a merchant under the first definition of merchant provided for in the statute: a
21 person who deals in goods of the kind.   As part of his crop-dusting business, Mecham
22 bought and sold airplanes.  During the approximately 18 years he operated that business,
23 Mecham owned between 10 and 12 planes, and only four or five planes in any given year.
24 From these numbers, one can infer that Mecham bought, sold, or traded no more than one
25 plane in any given year.  The occasional sale of goods used to operate a business would
26 hardly seem to qualify a business as owner as a merchant of that good.  By way of analogy,
27 it would be difficult to find that a business which utilized four or five computers and
28 upgraded approximately one computer per year, selling it and replacing it with a new one,

1   would qualify as a computer merchant.  Instead, the instant definition of merchant appears
2   to focus on sellers whose business is the sale of the good in question.  See Powers v.
3   Coffeyville Livestock Sales Co., 665 F.2d 311, 312 (10th Cir. 1981) (suggesting that one
4   who deals in goods of the kind is one who regularly and frequently sells a particular good).
5   Mecham's business was crop-dusting, not the sale of airplanes, and the Court finds that he
6   did not sell airplanes frequently enough in the course of that business—one in a year, at
7   most—or in the years after, that it can be said he dealt in airplanes, especially without
8   evidence that the sale of those Planes was for profit or otherwise part of how Mecham made
9   a living.  Cf. Sessa v. Riegle, 427 F. Supp. 760, 769 (E.D. Pa. 1977) (holding a seller of a
10  horse to be a merchant where an agent of the seller had, in the past, engaged in buying,
11  selling, owning, and training horses *for a living*).   While Plaintiff did introduced evidence
12  showing that after selling the crop-dusting business Mecham briefly held one of his
13  airplane's in a corporation, this is not enough for the Court to find that Mecham is a
14  merchant, especially since Mecham testified he did so only for liability reasons.

15       Although not a dealer of airplanes, the Court finds that Mecham is a merchant
16  because he "holds himself out as having knowledge or skill peculiar to the practices or
17  goods involved in the transaction."  Due to his years as a crop duster Mecham has a
18  wealth experience owning and operating airplanes like the Cesna 185 he sold to Ram
19  Head.  See Eichenberger v. Wilhelm, 244 N.W.2d 691, 696 (N.D. 1976) ("By his own
20  testimony relating to his decades of experience in aerial spraying, his licensing by state
21  and federal authorities, and his training in the use of Carbyne, Wilhelm established
22  himself as a 'merchant.'"). This experience also made Mecham intimately familiar with
23  the unique type of flying undertaken by Ram Head's pilots.  Accordingly, Mecham
24  possesses both skill and knowledge as to the Plane.  Having so determined, the question
25  becomes, did Mecham hold himself out to Simpson as possessing that skill and
26  knowledge?   The Court answers in the affirmative.  Mecham made his skill and
27  knowledge well known to Simpson, explaining to Simpson the similarity between the
28  flying involved in crop dusting and in Ram Head's outfitting business.  Consequently, the

1   Court finds that Mecham is a merchant.

2           **b.    There was no modification of the warranties**

3                   **pursuant to § 47-2316.**

4           For the same reasons discussed in the section of this order considering the

5   application of section 47-2316 to the implied warranty of fitness for a particular purpose,

6   the Court finds that section 47-2316 does not operate to destroy Ram Head's right to

7   recovery under the implied warranty of merchantability.  See Section A(1)(c), *supra*.

8   Accordingly, Ram Head has proven that Mecham breached the implied warranty of

9   merchantability, and Ram Head is entitled to damages, which the Court turns to presently.

10                  **iii.    Damages**

11          Ram Head is entitled to damages for both of its implied warranty claims.  Damages

12  for breach of warranty under the UCC are generally measured by the difference between

13  the value of the good as sold and the value of the good if it had been as warranted.  See

14  A.R.S. § 47-2714.  "This section[, however,] is not exclusive of the buyer's remedies

15  where the property is not totally destroyed. If by reasonable expenditure goods may be

16  made to conform to the warranty, the amount of such expenditure may be the measure of

17  such damages." Downs v. Shouse, 501 P.2d 401, 406 (Ariz. App. 1972).  Accordingly,

18  the Court will measure damages by the amount spent on "repairs incurred as a result of

19  the breach of warranty," id. (using this measure of damages in a case concerning a used

20  aircraft that was not in the condition warranted by seller), plus incidental and

21  consequential damages.  A.R.S. § 44-2394 (allowing for incidental and consequential

22  damages); see also Miles v. Kavanaugh, 350 So. 2d 1090, 1093 (Fla. App.  1977)

23  (holding that "the measure of damages in a breach of warranty action in the sale of a

24  defective airplane may include the expense of transporting the airplane for repairs, the

25  expense of overhauling the airplane, and the damages due to a loss of use of the airplane

26  during repairs").

27          Turning first to the amount reasonably spent on repairs, Ram Head has requested

28  $113,935.87 in connection with repairs made to the Plane.  "It is firmly established, of

1  course, in this state as elsewhere, that certainty in amount of damages is not essential to

2  recovery when the fact of damage is proven." Gilmore v. Cohen, 95 Ariz. 34, 36, 386

3  P.2d 81, 82 (1963) (internal quotation omitted). A plaintiff must, however, provide some

4  basis for estimating its loss.  Id. Ram Head has met its burden, as the cost of the repairs

5  which form the basis of its damages request are backed up by invoices from the business

6  which undertook the repairs, Edmonton Flying Club, Arado Aero, and Harv Air.  (See

7  Doc. 98, exh. 7a).  Defendants have never questioned the authenticity of these documents

8  or alleged that the amount charged therein was unreasonable. Instead, the disputed issue

9  concerns the necessity of the repairs.  Ram Head, through its experts, contends that all of

10 the repairs were necessary to make the Plane airworthy.  Defendants, on the other hand,

11 assert that many of the repairs were not required, unnecessary, or duplicative.  In other

12 words, Defendants allege that the Plane was not merely made airworthy, but underwent a

13 full restoration, bringing it to a condition neither warranted nor represented by Mecham.

14       After reviewing carefully reviewing the record and the Parties' supplemental

15 briefing on this issue, the Court is not persuaded by Defendants' contentions concerning

16 the repairs.  In their item-by-item opposition to the repairs made to the Plane, Defendants

17 rely on three primary objections: product improvement, unnecessary restoration, and

18 needed only after Aircraft was unnecessarily dismantled.  In making these objections

19 Defendants rely on the testimony of Mace and the deposition of Roger Jaworski.  Turning

20 to Jaworski's deposition first, the Court notes that all of his testimony concerning the

21 necessity of the repairs made to the Plane (or lack thereof) is based on his general

22 experience working on aircraft, not actual hands-on experience with the Plane.

23 Accordingly, the Court can only assign his opinion so much weight.  As for Mace, he

24 damaged his credibility with this Court by admitting on cross-examination to having done

25 less than a full annual-type inspection on the Plane. Additionally, Mace's testimony

26 evidences a cavalier attitude towards mechanical defects which gives this Court pause.

27 For example, on cross-examination, Mace admitted, that during his deposition, he stated

28 that an airplane's gear box will generally pass inspection, unless its "some big mess."

1    Although he defended this remark as only a figure of speech, this attitude is reflected in

2    the failure to conduct a true annual inspection, and makes this Court question whether

3    Mace's definition of necessary repair is too stringent and, as a result, his idea of what

4    constitutes a restorative or merely cosmetic repair is misguided.  On the other hand, the

5    Court found very credible the testimony of Plaintiff's expert, Patrick Parsonage.  Unlike

6    Mace, Parsonage is not a stakeholder in this case.  He is also a highly trained,

7    experienced, and well credentialed airplane mechanic who, unlike Jaworski and Mace,

8    physically inspected the Plane.   He testified that all of the repairs made were necessary to

9    bring the Plane up to its original design standard, which he explained is the purpose of

10   both the Canadian and American versions of an annual inspection.  Furthermore, he made

11   clear that none of the repairs were improvements, and that their purpose was not to "take

12   a sow's ear and make it into a silk purse," but instead to "take a badly maintained silk

13   purse and make it a silk purse again."  (R.T., Doc. 92, 69:18–22).  The Court finds the

14   Parsonage testimony credible and persuasive.

15        Therefore, in considering the necessity of the repairs in question, the Court will

16   defer to the expertise of Parsonage, instead of Mace.  Accordingly, it finds that Ram Head

17   is entitled to be reimbursed by Mecham for the full cost of the repairs done to the Plane in

18   Canada, $110,863.83.[1]  As for consequential damages, the Court also finds that Ram

19   Head is entitled to recover the $9,285.91 it spent of leasing a replacement plane for the

20   2008 hunting season.  Ram Head is not, however, entitled to recover the $16,223.08 it

21   paid to Mace to install the after-market upgrades, conduct an annual inspection, and

22

23

24        [1]Pursuant to Federal Rule fo Evidence 201, for the purpose of calculating damages,
     the Court has taken judicial notice of the exchange rate between the U.S. dollar and the
25   Canadian dollar during the relevant times, converting all damages initially incurred in
     Canada currency to a commiserate U.S. dollar amount.  See, e.g., Vathana v. EverBank, 2010
26   U.S. Dist. LEXIS 35665, *5 n.3 (N.D. Cal. Mar. 15, 2010) (taking judicial notice of the
     ISK-USD exchange rate on certain dates); Mamani v. Berzain, 636 F. Supp. 2d 1326, 1328
27   n4 (S.D. Fla. 2009) ("I take judicial notice of … the exchange rate of the Boliviano to the
     U.S. dollar pursuant to Federal Rule of Evidence 201.")
28

1    secure the export C of A.  Unlike the other damages awarded by the Court, Ram Head did

2    not incur these costs as a consequence of Mecham's breach of warranty.  Ram Head is

3    entitled to recover $120,149.74 on each of its warranty claims.

4                    **2.      Contract claim against Mecham**

5           Ram Head alleges that Mecham breached their contract by selling him a Plane that

6    was not airworthy.  "[I]n an action based on breach of contract, the plaintiff has the

7    burden of proving the existence of a contract, breach of the contract, and resulting

8    damages."  Chartone, Inc. v. Bernini, 207 Ariz. 162, 170 (Ct. App. 2004).   Contracts for

9    the sale of goods are governed by Arizona's version of the Uniform Commercial Code

10   ("UCC"), A.R.S. § 47-2101, et seq..  A.R.S. § 47-2102 ("Unless the context otherwise

11   requires, this chapter applies to transactions in goods….").

12          The Parties entered into an oral contract on March 24, 2008, in which Simpson

13   promised to purchase the Plane from Mecham for $117,500.00.  At that time, Mecham

14   and Simpson did not agree to any other contract terms or discuss the condition of the

15   Plane.  On March 31, 2008, Mecham and Simpson drew up the Bill of Sale, which set

16   forth in writing that Ram Head had purchased the Plane from Mecham free and clear of

17   all liens for $117,500.00.  Once again, no mention was made of the Plane's condition.

18   Ram Head argues, however, that the condition of the Plane was a term of the contract

19   because Mecham had represented to Simpson during the Parties' negotiations that the

20   Plane was in good condition and suitable for Ram Head's needs (which, at a minimum,

21   required an airworthy Plane).  In support of this position, Ram Head cites the Court to §

22   47-2202 of the UCC, which explains that a confirmatory memoranda that the parties did

23   not intend to be a complete and exclusive statement of the terms of their agreement may

24   be explained or supplemented "[b]y evidence of consistent additional terms."  A.R.S. §

25   47-2202.  The Court finds that the Bill of Sale constitutes a confirmatory memoranda of

26   the Parties' agreement and that there is no evidence the Parties intended for it to be a

27   complete and exclusive statement of the terms of their contract.  Instead, the Bill of Sale

28   is just what it purports to be; a bill of sale.  Accordingly, the Court will consider whether

1    any consistent additional terms exist that explain or supplement the BOS and must be
2    construed as part of the Parties' contract.

3          Such additional explanatory terms are found in the course of the Parties'
4    negotiations concerning the Plane.  Simpson made clear to Mecham that he was seeking a
5    Plane to use in his business, not a fixer-upper or a plane from which to salvage spare
6    parts.  In other words, he clearly sought an airworthy plane.  Mecham made clear to
7    Simpson that the Plane was in good condition, and these representations comported with
8    the Trade-a-Plane advertisement for the Plane, which boasted of a clean, fast plane.
9    Additionally, as his testimony of November 10, 2010, demonstrates, by telling Simpson
10   that the Plane was in good condition, Mecham intended to convey the message that the
11   Plane was, at a minimum, airworthy and safe for flight.  Specifically, Mecham testified
12   that he would never have flown the Plane if he did not think it was in good condition.  In
13   short, it is clear to this Court that in negotiating for the Plane, both Simpson and Mecham
14   understood they were discussing an airworthy Plane that Ram Head could start using
15   without major repair and therefore that the Plane's airworthy condition was a term of their
16   contract.  Because the Plane delivered to Simpson was not airworthy, Mecham delivered
17   a non-conforming good, breaching the contract.

18         Turning to damages, under the UCC, "Where the buyer has accepted goods and
19   given notification (subsection C of section 47-2607) he may recover as damages for any
20   non-conformity of tender the loss resulting in the ordinary course of events from the
21   seller's breach as determined in any manner which is reasonable," A.R.S. § 47-2714, plus
22   consequential and incidental damages.  Id. § 47-2715.  The Arizona Court of Appeals
23   interprets this rule as meaning that a buyer may recover "those [damages] proximately
24   caused by the breach," and that the "aim is to yield the net amount of losses caused."
25   Northern Ariz. Gas Serv. v. Petrolane Transport, 145 Ariz. 467, 478 (Ct. App. 1984)

26         Turning first to notice, the Court notes that what constitutes notice "is liberally
27   construed." Davidson v. Wee, 93 Ariz. 191, 199 (1963).  The record shows that after
28   learning of the Plane's defects, Simpson contacted both Mace and Mecham, informing

1  them of the problems discovered during the Canadian importation inspection, and that

2  neither of them took steps to remedy the situation, with Mecham expressing his opinion

3  that the Plane was fine when it left Arizona.  Accordingly, the Court finds that  Ram Head

4  gave notice of the non-conforming nature of the Plane and is entitled to damages.  See

5  Mountain-Aire Refrigeration & Air Conditioning Co. v. Gen. Elec. Co., 146 Ariz. 30, 33

6  (Ct. App. 1985) ("The purpose of requiring notice is to enable the seller to make

7  adjustments or replacements or to suggest opportunities for cure to the end of minimizing

8  the buyer's loss and reducing the seller's liability.").

9          As for the amount of damages, the Court finds that the damages proximately

10  caused by the breach are the costs Ram Head incurred making the Plane airworthy and

11  the cost of renting a replacement Plane, for an award of $120,149.74**.**  As with the implied

12  warranty claims, Ram Head cannot recover against Mecham for the $16,223.08  it paid

13  Mace to inspect the Plane, procure the Export C of A, and  install the after-market

14  upgrades.  These expenses were not caused by Mecham's breach and therefore are not

15  recoverable.

16                          **3.      Contract claim against Mace**

17          Once again, the elements of breach of contract are the existence of a contract, its

18  breach, and resulting damages.  Chartone, Inc. v. Bernini, 207 Ariz. 162, 170 (Ct. App.

19  2004).  Ram Head alleges that it entered into two service contracts with Mace, and that

20  Mace breached both.   First, Ram Head claims that Mace agreed to, but did not perform a

21  pre-purchase inspection of the Plane.  Second, Ram Head charges that Mace agreed to

22  issue a valid Export C of A, but did not follow through on his promise.

23                          **i.      Pre-purchase inspection contract**

24                                  **a.      Mace breached by failing to preform a pre-
                                          purchase inspection of the Plane**

25

26          As part of its findings of fact, the Court found that Simpson asked Mace, and Mace

27  agreed, to perform a pre-purchase inspection of the Plane.  Mace denies that he was asked

28  to perform a pre-purchase inspection and, accordingly, that he preformed one.  Mace's

1   denial simply does not ring true.  First, Simpson had recently been in airplane accident,

2   and was clearly concerned about purchasing a safe airplane.  Second, Simpson clearly

3   expressed his desire to have a pre-purchase inspection to Mecham.  Third, Simpson

4   testified that he was not familiar with United States airplane paper work, but knew that

5   the paperwork needed to be in order before the Plane could be imported to Canada.

6   Finally, it does not make sense that Simpson would have given Mecham a $1,000.00

7   deposit for the purpose of preventing Mecham from selling the Plane over the weekend if

8   Mace had not agreed to conduct the pre-purchase inspection over that weekend.

9   Consequently, the Court finds that Mace agreed to perform the requested pre-purchase

10  inspection, and that Mace admitted breach when he testified that he did not perform any

11  type of pre-purchase inspection on the Plane.

12                              **b.      Damages**

13         Mace's breach caused Ram Head damage.  Simpson testified that it was his

14  expectation Mace would go from one end of the Plane to the other to ensure its safety.

15  Although Simpson may not have specifically conveyed this expectation to Mace, the

16  Court finds that the tasks which he did ask Mace to perform—AD compliance and

17  document checks—could not have been completed without some physical inspection of

18  the airplane.  For example, ensuring that any modifications made to the Plane were

19  supported by the accompanying paperwork is a task that requires comparing the physical

20  condition of the airplane to the characterization of the repair in the documentation.

21  Likewise, Mace could not ensure the Plane was AD compliant without checking the Plane

22  itself.  On direct examination, Parsonage testified that when the Plane arrived in Canada,

23  its records did not match its condition.  For example, Parsonage explained that various of

24  the Plane's 337s, which are FAA document's that detail major repairs and alterations to

25  an airplane, were missing or failed to adequately explain repairs that had been made to the

26  aircraft (and which were unsafe).  Had Mace conducted the bargained for inspection, he

27  would have at a minimum discovered the incongruity between the Plane and its records,

28  and likely would have seen many of the other safety hazards uncovered by Parsonage.

1  Simpson testified that had he known about the multitude of problems with the Plane, he

2  would not have agreed to its purchase,   He also explained that he would not have bought

3  the Plane for even another $5,000.00 or $10,000.00, sums which are far below the cost it

4  took to bring the Plane to an airworthy condition.  Accordingly, Mace's failure to perform

5  the pre-purchase inspection damaged Simpson by causing him to enter into a contract into

6  which he otherwise would not have entered.

7      In a contract for sales, the purpose of damages is to put the plaintiff in as a good a

8  condition as if the defendant had fully performed the contract.  See County of Maricopa

9  v. Walsh & Oberg Architects, 494 P.2d 44, 46 (Ariz. Ct. App. 1972) (citing the

10  RESTATEMENT OF CONTRACTS (1932)).  Had Mace fully performed, Simpson would have

11  known, at a minimum, that there were numerous problems with the Plane's paperwork.

12  Additionally, the ease with which Parsonage detected the defects in the Plane, suggests a

13  proper pre-purchase inspection would have unturned some of the other mechanical

14  defects that plagued the Plane. Accordingly, by failing to undertake the inspection, Mace

15  deprived Simpson of information which would have prevented him from contracting with

16  Mecham.   Accordingly, Ram Head is entitled to damages incurred as a result of that

17  contract, including the cost of the Plane's repairs and for renting a replacement plane for

18  the 2008 hunting season.  Once again, however, the Court declines to award Ram Head

19  the cost of the after-market upgrades done by Mace.   Contract damages are

20  compensatory, and a successful plaintiff should not profit from his claim. Norwest Bank

21  (Minnesota), N.A. v. Symington, 197 Ariz. 181, 189 (Ct. App. 2000)  Ram Head has not

22  alleged that the installation of the upgrades was deficient, and it appears to have enjoyed

23  the benefit of its bargain on the now repaired and airworthy Plane.  Ram Head is awarded

24  $120,149.74 in damages.

25          **ii.    Export C of A Contract**

26                  **a.    Mace breached by failing to conduct the required
                           annual-type inspection.**

27

28  The record shows that Mace agreed to procure and have issued a valid Export C of

1    A for the Plane.  Technically, Mace performed, getting an Export C of A for the Plane.

2    Under cross-examination, however, Mace admitted that he did not conduct the annual-

3    type inspection required before an Export C of A can issue.  14 CFR 21.329(c) ("Used

4    aircraft must have undergone an annual type inspection and be approved for return to

5    service in accordance with Part 43 of this chapter.").  By failing to conduct the annual-

6    type inspection, Mace breached his agreement with Ram Head.  An Export C of A is

7    more than just a piece of paper; it is a substantive guarantee of a Plane's airworthiness.

8    Accordingly, by failing to undertake the annual-type inspection, the purpose of which is

9    to ensure a Plane is airworthy, Mace deprived Ram Head of the benefit of its bargain for

10   the Export C of A.  In other words, in asking that Mace produce an Export C of A, it is

11   implied that he would conduct an annual inspection.  See Golder v. Crain, 437 P.2d 959,

12   961 (Ariz. Ct. App. 1968) ("Implied terms are as much a part of a contract as those which

13   are expressed.").  By failing to do so, Mace breached his contract with Ram Head.

### b.    Damages

15        Mace's breach caused Ram Head damage.  It is clear to the Court that had Mace

16   conducted the required annual-type inspection, he would have discovered the numerous

17   defects found by Parsonage, as Parsonage discovered the majority of the problems with

18   the Plane after only two hours of inspection.   Had those defects been discovered by

19   Mace, as they should have been, Simpson would been alerted to their presence prior to

20   taking possession of the Plane and would have undoubtedly exercised his right to rescind

21   the contract.  See A.R.S. § 47-2601 (stating that a buyer, "if the goods or the tender of

22   delivery fail in any respect to conform to the contract," may reject the goods); id. § 47-

23   2608 (stating that a buyer may revoke his acceptance of a good when his "acceptance was

24   reasonably induced either by the difficulty of discovery before acceptance or by the

25   seller's assurances.").  In so deciding, the Court notes that the damages discovered by

26   Parsonage were neither few nor minor.  Instead they were substantial and costly.

27   Simpson stated that he would not have entered into the contract had he been aware of the

28   Plane's many defects.  From this testimony, the Court can infer that Simpson would have

1   sought to cancel the contract had he been altereted about the defects by Mace.  Given the

2   severity of the damage to the Plane, the Court is confident Ram Head would have been

3   successful in such an effort.   Because Mace deprived Ram Head of its chance to get out

4   of the contract, Ram Head may recover all damages caused to Ram Head by the loss of

5   this opportunity.  This includes the cost of the repairs to the Plane and the cost to rent a

6   Plane for the 2008 season.  Additionally, Ram Head recovers the cost it paid to Mecham

7   for the annual inspection and export C of A, which is $2,500.00.  It may not recover,

8   however, for the cost of the after-market upgrades, as the agreement for these upgrades

9   was made after Ram Head entered into the Contract with Mecham, but before Mace

10   would have completed the annual inspection.  Accordingly, even if Mace had performed

11   the annual inspection and Ram Head had canceled the contract, it still would have owed

12   Mace for any work Mace did on the Plane, including the upgrades.  Additionally, Ram

13   Head appears to have enjoyed the benefits of Mace's work on the upgrades.  Ram Head

14   recovers $122,649.74

15                              **4.   Payment of Damages**

16          Ram Head has prevailed on four separate contract-based claims against these

17   Defendants, and the Court has awarded damages as to each claim.   The injury for which

18   Plaintiff sought redress on these claims, however, is common to all claims.  Because

19   contract damages are compensatory, not punitive, a plaintiff may not recover twice for the

20   same injury, even though more than one party may have caused the harm.  Norwest Bank

21   (Minnesota), N.A., 197 Ariz. at 189.  In other words, a Plaintiff should not profit from its

22   contract based claims, but should merely be made whole.  See id. (citing "the contractual

23   damage rule that no one shall profit more from the breach of an obligation than from its

24   full performance.").  As to each claim, the Court has found that Ram Head should, at a

25   minimum, recover, $120,149.74, an amount which represented the costs incurred in

26   making the Plane airworthy and for renting a Plane for the 2008 season.  Because the

27   Court will not allow Plaintiff to recover more than once for its contractually based harms,

28   it finds that Plaintiff may only recover the $120,149.74 one time and as a result will hold

1  Defendants joint and severally liable.  Lesmeister v.Atlantic Building Systems, Inc., 330

2  N.W.2d 95, 102 (Minn. 1983) ("Where A and B owe contract duties to C under separate

3  contracts, and each breaches independently, and it is not reasonably possible to make a

4  division of the damage caused by the separate breaches closely related in point of time,

5  the breaching parties, even though they acted independently, are jointly and severally

6  liable.").

7          **B.**     **Claims Sounding in Tort**

8               **1.**     **Negligent misrepresentation against Mecham**

9         Ram Head alleges that Mecham negligently misrepresentated the condition of the

10  Plane.  Arizona has adopted the tort of negligent misrepresentation as set forth in the

11  Restatement (Second) of Torts § 552. Formento v. Encanto Business Park, 154 Ariz. 495,

12  499, 744 P.2d 22, 26 (App. 1987).  A person who commits negligent misrepresentation is:

13          One who, in the course of his business, profession or employment, or in any
        other transaction in which he has a pecuniary interest, supplies false

14          information for the guidance of others in their business transactions, is
        subject to liability for pecuniary loss caused to them by their justifiable

15          reliance upon the information, if he fails to exercise reasonable care or
        competence in obtaining or communicating the information.

16  St. Joseph's Hosp. & Med. Ctr. v. Reserve Life Ins. Co., 154 Ariz. 307, 742 P.2d 808, 813

17  (Ariz.1987) (quoting RESTATEMENT (SECOND) OF TORTS § 552 (1977)).  As the Plane's

18  owner, it is clear that Mecham had a pecuniary interest in its sale.   Mecham told Simpson

19  the Plane was in good condition and would work well for Ram Head.  Neither statements

20  were true, as the Plane had numerous mechanical defects which caused the Canadian

21  authorities to find it unworthy for flight.  It is also clear, that Simpson relied on

22  Mecham's representations about the Plane in electing to purchase it.  The more difficult

23  question concerns whether Mecham failed to exercise reasonable care in obtaining the

24  false information that he communicated to Simpson concerning the condition of the Plane

25         Because negligent misrepresentation is based on the concept of negligence, "the

26  defendant is subject to liability if, but only if, he has failed to exercise the care or

27  competence of a reasonable man in obtaining or communicating the information."

28

1   RESTATEMENT (SECOND) OF TORTS § 552 cmt. e (1977).   Having carefully considered the

2   issue, the Court finds that Mecham did not act unreasonably in obtaining and

3   communicating the information.  Mecham stated that the Plane was in good condition.

4   From the evidence in record, it appears that Mecham had good reason to believe this was

5   the case.  Since purchasing the Plane in 2006, the Plane had undergone two annual

6   inspections, passing each of them, and one having been performed only months before

7   Ram Head purchased the Plane.  Additionally, nothing in the record suggests that

8   Mecham knew of or concealed from Simpson a mechanical defect that had arisen

9   subsequent to the last annual inspection.  In short, in telling Simpson the Plane was in

10  good condition, the Court finds that Mecham relied on the fact that the Plane had recently

11  passed inspection and had not exhibited any other mechanical defects.  Was this

12  reasonable?  The Court finds that it was.  An owner of an airplane should be able to rely

13  on the word of his mechanic with respect to the condition of that plane, so long as that

14  inspection is fairly recent.  Because the Plane had recently undergone an annual

15  inspection, it was not unreasonable for Mecham to convey to Simpson his belief that the

16  Plane was in good condition and would, therefore, suit Ram Head's needs.  Accordingly,

17  Ram Head has not proven negligent misrepresentation against Mecham.

18                    **2.      Consumer fraud against Mecham**

19           Ram Head has also charged Mecham with consumer fraud.  In Arizona, consumer

20  fraud is prohibited by the Consumer Fraud Act, which "provides an injured consumer

21  with an implied private right of action against the violator of the act."   Holeman v. Neils,

22  803 F. Supp. 237, 242 (D. Ariz. 1992).  The elements of a consumer fraud claim are  "a

23  false promise or misrepresentation made in connection with the sale or advertisement of

24  merchandise and the hearer's consequent and proximate injury."  Id.  " Damage or injury

25  occurs when the consumer relies on the misrepresentation even though the reliance is not

26  reasonable."  Id. (citing  Correa v. Pecos Valley Dev. Corp., 126 Ariz. 601, 605, 617 P.2d

27  767, 771 (App. 1980)).

28           Mecham represented that the Plane was in good condition when in fact it was

1   not, and this representation was made in conjunction with the sale of the Plane.  Taken in

2   its proper context, Mecham's representation that the Plane was in good condition was

3   clearly and reasonably understood by Simpson as a representation concerning the

4   airworthiness of the Plane.  See  Godwin Aircraft, Inc. v. Houston, 851 S.W.2d 816,

5   821-22 (Tenn. App. 1992) (affirming trial court finding that defendant made fraudulent

6   misrepresentations in the sale of an aircraft where defendant falsely represented that

7   aircraft was airworthy, which representation was relied on by plaintiff in entering the

8   transaction); United States v. Vicars, 465 F.2d 720, 722-23 (6th Cir. 1972)

9   (representations of airworthiness are properly considered "badges of fraud").

10  Additionally, "[i]ntent to deceive is not required under the Arizona Consumer Fraud Act,"

11  only an intention do the action." State ex rel. Corbin v. Tolleson, 160 Ariz. 385, 398 (Ct.

12  App. 1989).  Mecham clearly meant to represent that the Plane was airworthy and, as a

13  result, he satisfies the misrepresentation element of this fraud claim.  Simpson relied upon

14  this misrepresentation, purchasing the Plane, and was injured as a result.   Accordingly,

15  Ram Head as proven consumer fraud, and is entitled to recover damages.

16       In actions sounding in tort, the measure of damages is that which places the injured

17  party in the position he would have been in had the tortious conduct not occurred.

18  Thompson v. Better-Bilt Aluminum Prods. Co., 171 Ariz. 550, 554 ( 1992).  In other

19  words, a plaintiff is entitled to "all damages legally caused by the tort." Id.   In

20  determining whether a defendant's tortious conduct caused a plaintiff's damages, the

21  court must wrestle with two considerations: (1) "the tort must be a substantial factor in

22  bringing about the harm;" and (2) whether, when looking back, it "it appears to the court

23  highly extraordinary that [the tortious conduct] should have brought about the harm." Id.

24  (internal quotations omitted) (citing the RESTATEMENT (SECOND) OF TORTS)).  Had

25  Mecham not misinformed Simpson that the Plane was in good condition, he would not

26  have entered into the contract for the Plane, sparing him from the damage and other

27  expenses he incurred as a result of that transaction.   Additionally, it is not highly

28  extraordinary that Mecham's conduct brought about the complained of harm. To the

1  contrary, the harm suffered by Ram Head is exactly the type of non-fatal harm one would

2  expect a misrepresentation about the quality of an airplane to cause.  Accordingly, the

3  Court finds that Ram Head is entititled to recover $136,372.82, which includes all costs

4  incurred by Ram Head as a result of contracting with Mecham, a decision which was the

5  direct consequence of Mecham's act of consumer fraud.  This award, unlike the ones

6  made in contract, reimburses Ram Head the costs paid to have the after-market upgrades

7  installed and to have the Export C of A procured.  These damages are properly awarded

8  in tort because Ram Head would not have incurred these expenses were it not for

9  Mecham's act of consumer fraud.

10  ### 3.      Negligent misrepresentation against Mace

11  Ram Head also accuses Mace of negligent misrepresentation.  A person who

12  commits negligent misrepresentation is:

> One who, in the course of his business, profession or employment, or in any
> other transaction in which he has a pecuniary interest, supplies false
> information for the guidance of others in their business transactions, is
> subject to liability for pecuniary loss caused to them by their justifiable
> reliance upon the information, if he fails to exercise reasonable care or
> competence in obtaining or communicating the information.

St. Joseph's Hosp. & Med. Ctr,, 154 Ariz. at 742.  Ram Head alleges that Mace

negligently represented to Simpson that the plane was in good shape, when in fact it was

not airworthy.

As an initial matter, the Court finds that Mace had the necessary pecuniary

interest.  The comments to the Restatement explain, a "defendant's pecuniary interest in

supplying the information will normally lie in a consideration paid to him for it or paid in

a transaction in the course of and as a part of which it is supplied."  RESTATEMENT

(SECOND) OF TORTS § 552 cmt. d.  However, "the fact that the information is given in the

course of the defendant's business, profession or employment is a sufficient indication

that he has a pecuniary interest in it, *even though he receives no consideration for it at the*

*time.*"  Id. (emphasis added).   Mace informed Simpson that the Plane was in good shape.

Although he does not appears to have received consideration for this information at the

1   time, Mace had a pecuniary interest because the misrepresentation was made in the course

2   of his capacity as a professional mechanic.  Turning to the rest of the factors, the Court

3   finds that Mace supplied Simpson with false information.  Namely, he informed Simpson

4   that the Plane was in good shape, when in fact it was not.  Additionally, Mace failed to

5   exercise reasonable care in obtaining the information.  It is no excuse that Mace had

6   performed an annual inspection on the Plane previously.  Quite simply, it was

7   unreasonable for Mace, especially because he is an airline mechanic, to convey his belief

8   that the Plane was in good shape without actually knowing the absolute truth of this

9   statement at the moment it was made.  The Court finds for Ram Head as to negligent

10  misrepresentation.

11        Damages are appropriate because Mace's negligent act was a substantial factor in

12  Ram Head's injuries.  The fact that Simpson sought out a pre-purchase inspection

13  demonstrates he valued the opinion of a professional mechanic concerning the Plane's

14  safety.  By negligently telling Simpson that the Plane was in good shape, Mace confirmed

15  Mecham's representation of the Plane as in good condition, undoubtedly influencing

16  Simpson's decision to purchase the Plane, something Simpson did shortly after receiving

17  Mace's assurance of safety.  Accordingly, the Court awards damages in the amount of

18  $136,372.82, an amount which represents all expenses incurred by Ram Head as a result

19  of entering into the contract with Mecham.

20                    **4.        Professional Negligence against Mace**

21        Ram Head's final cause of action against Mace is for professional negligence.  To

22  establish negligence, a party must prove: "(1) the existence of a duty recognized by law

23  requiring a defendant to conform to a certain standard of care, (2) the defendant's breach

24  of that duty, (3) a causal connection between the breach and the resulting injury, and (4)

25  actual damages. See Grafitti-Valenzuela ex rel. Grafitti v. City of Phoenix, 216 Ariz. 454,

26  457, 167 P.3d 711, 714 (Ct. App. 2007).  Ram Head alleges that Mace acted negligently

27  by failing to inspect and repair the Plane in a reasonable manner, both before and after its

28  sale to Ram Head.

1    The Court turns first to the issue of a duty.  "If no duty exists, the defendant is not

2    liable for a plaintiff's loss, even though the defendant may have acted unreasonably in

3    light of the foreseeable risk."  Ferguson v. Cash, Sullivan & Cross Ins. Agency, 171 Ariz.

4    381, 386 (Ct. App. 1991).  "The question of duty is decided by the court. The question is

5    whether the relationship of the parties was such that the Defendant was under an

6    obligation to use some care to avoid or prevent injury to the Plaintiff."  Alhambra Sch.

7    Dist. v. Superior Court, 161 Ariz. 568, 570, 780 P.2d 401, 403 (1989).  As a general rule,

8    a professional owes a duty of care to his client.  Barmat v. John & Jane Doe Partners

9    A-D, 155 Ariz. 519, 523 (1987) ("As a matter of public policy, attorneys, accountants,

10   and other professionals owe special duties to their clients, and breaches of those duties are

11   generally recognized as torts."); cf. Napier v. Bertram, 191 Ariz. 238, 242 (1998)("The

12   general rule is that a professional owes no duty to a non-client unless special

13   circumstances require otherwise.").  Accordingly, the Court finds that Mace, as a

14   processional airplane mechanic, owed a duty to Ram Head, his client, and that duty was

15   to exercise ordinary care by acting as a reasonably prudent airplane mechanic under the

16   circumstances.  See Flagstaff Affordable Hous. Ltd. P'ship v. Design Alliance Inc., 221

17   Ariz. 433, 437 (Ct. App. 2009) ("Our supreme court has also explained that design

18   professionals have a duty to use ordinary skill, care, and diligence in rendering their

19   professional services." (internal quotations omitted)).  Phillips v. Findlay, 507 P.2d 687,

20   693 (Ariz. Ct. App. 1973) (finding that the standard to be applied to an insurance agent's

21   actions was that "that of the reasonably prudent person under the circumstances."

22   (internal quotation omitted)).

23   Having established the standard of care, the Court turns next to the question of

24   breach.  Plaintiff asserts that Mace breached his duty of care on two separate occasions,

25   first by failing to conduct the pre-purchase inspection and second by failing to properly

26   inspect the Plane when procuring the Export C of A.  As for the pre-purchase inspection,

27   the Court finds that a reasonable airline mechanic who agreed to conduct a pre-purchase

28   inspection of an airplane would in fact conduct such an inspection prior to rendering any

professional opinion about the quality of that airplane.  Accordingly, by telling Simpson the Plane was in good shape, Mecham breached his duty to Simpson.   Mace's post-purchase actions compel the same conclusion.  Mace agreed to secure an Export C of A for Ram Head.  In undertaking this task, a reasonable airplane mechanic would have completed all the necessary steps and inspections required for certification before attesting to their completion on the Export C of A application.  Mace, however, did not complete the required  annual-type inspection.  Instead Mace merely assumed that any mechanical defects that should have been discovered during an annual-type inspection, would have been found during the installation of the after-market upgrades.  Making such an assumption with respect to an annual-type inspection, the very purpose of which is to ensure the Plane is airworthy and safe, is a clear breach of Mace's duty to act as reasonable airplane mechanic.

As for the rest of the factors, there is a causal connection between the breach and the resulting injury. As the Court has already explained, a pre-purchase inspection would have demonstrated, at a minimum, that the Plane's condition did not match up with its documentation and uncovered some, but not all, of the safety defects later found by Parsonage.  This information would have been known to Simpson before agreeing to purchase the Plane and would have altered his decision to do so.   Had Mace conducted the required annual-type inspection, he also would have discovered the numerous defects found by Parsonage during his inspection of the Plane, giving Ram Head an opportunity to cancel its contract with Mecham.   Plaintiff has proven professional negligence against Mace.

These actions very clearly caused Plaintiff's damage and that they did so is not highly extraordinary.  Accordingly, the Court awards Ram Head $136,372.82 for Mace's professional negligence in failing to conduct the pre-purchase inspection, and $120,149.74 for his professional negligence in failing to conduct an annual-type inspection during the Export C of A process.  The damage award for the failure to conduct the annual-type inspection is lessened by the cost of the after-market upgrades, as

1   those expenses were not caused by Mace's act of negligence with respect to the Export C

2   of A.

3                    **5.        Apportionment of Fault**

4            Because the separate tortious conduct of each Defendant caused the same harm to

5   Ram Head, the Court must consider apportionment of fault.   Arizona law does not

6   recognize joint and several liability for tort damages.  <u>See</u> A.R.S. § 12-2506; <u>Church v.</u>

7   <u>Rawson Drug & Sundry Co.</u>, 173 Ariz. 342, 350, 842 P.2d 1355, 1363 (Ct. App. 1992)

8   (upholding the constitutionality of A.R.S. § 12-2506).   Instead, the liability of each

9   defendant is several, and "[e]ach defendant is liable only for the amount of damages

10  allocated to that defendant in direct proportion to that defendant's percentage of fault." <u>Id.</u>

11  § 12-2506(A).  Because the Plaintiff's injuries are indivisible, the Court will apportion

12  damages under the indivisible injury rule.   <u>See</u> <u>Piner v. Superior Court of Ariz.</u>, 192 Ariz.

13  182, 190 (1998)("If the judge concludes there is no evidence that would permit

14  apportionment, then the case should be treated as one involving indivisible injuries.").

15  Under this rule, Ram Head's recovery is the total damage sustained, but the Court must

16  still allocate fault in accordance with A.R.S. § 12-2506, then "multiply each tortfeasor's

17  percentage of fault by the amount recoverable by the plaintiff."   <u>Id.</u> "Each tortfeasor in an

18  indivisible injury case is then severally liable for the product of that calculation."  <u>Id.</u> at

19  190–91.

20           Having carefully considered the facts of this case, the Court finds that these

21  Defendants share equally in the blame for Plaintiff's injuries.  Both made

22  misrepresentations which together caused Plaintiff to purchase the Plane, but Mace, as a

23  mechanic, should shoulder a slightly greater share of the responsibility, especially since

24  Mecham appears to have relied on Mace's opinion concerning the condition of the Plane.

25  Accordingly, the Court finds Mace sixty percent (60%) at fault and Mecham forty percent

26  (40%) at fault for the indivisible injury sustained by Plaintiff.  Mace therefore is

27  responsible for $81,823.69 in damages and Mecham is responsible for $54,549.13 in

28

1   damages.[2]

2       **Accordingly,**

3       **IT IS HEREBY ORDERED** finding that Defendant Gerald W. Mecham, Jr.

4   breached the implied warranty of fitness for a particular purpose as to Plaintiff Ram

5   Head, and awarding $120,149.74  in damages.

6       **IT IS HEREBY ORDERED** finding that Defendant Gerald W. Mecham, Jr.

7   breached the implied warranty of merchantability as to Plaintiff Ram Head, and awarding

8   $120,149.74 in damages.

9       **IT IS HEREBY ORDERED** finding that Defendant Gerald W. Mecham, Jr.

10  breached its contract with Plaintiff Ram Head, and awarding $120,149.74 in damages.

11      **IT IS HEREBY ORDERED** finding that Defendant Gerald W. Mecham, Jr. did

12  not commit negligent misrepresentation.

13      **IT IS HEREBY ORDERED** finding that Defendant Gerald W. Mecham, Jr.

14  committed consumer fraud against Ram Head and awarding $136,372.82 in damages.

15      **IT IS HEREBY ORDERED** finding that Defendant Robert C. Mace breached his

16  contracts with Ram Head, and awarding $136,372.82 as to the pre-purchase breach, and

17  $122,649.74 as to the export C of A breach.

18      **IT IS HEREBY ORDERED** finding that Defendant Robert C. Mace committed

19  professional negligence against Ram Head and awarding $136,372.82 in damages.

20      **IT IS HEREBY ORDERED** finding that Defendant Robert C. Mace committed

21  negligent misrepresentation against Ram Head and awarding $136,372.82.

22      **IT IS FURTHER ORDERED** finding that the torts committed against Ram Head

23  by Mecham and Mace caused an indivisible injury of $136,372.82, and that Mace is sixty

24  ───────────────

25      [2]The Court is aware that Defendants have raised the economic loss doctrine, arguing
    that Plaintiff should not be permitted to recover in both tort and contract.  Plaintiff, for its
26  part, has stated that it does not seek a double recovery for its injuries.  Before addressing this
    issue, the Court would prefer to have further briefing from the Parties.  Accordingly, to the
27  extent either Party wishes to raise the economic loss doctrine, the Court directs that it be done
28  as part of any post-trial motion that is filed with this Court.

1    percent (60%) responsible for the injury and that Mecham is forty percent (40%)

2    responsible for the injury.

3            **IT IS FURTHER ORDERED** that Defendants are jointly and severally liable for

4    $120,149.74 of the damages awarded on their contract-based claims.

5            **IT IS FURTHER ORDERED** directing the Clerk to enter judgment accordingly.

6            DATED this 13th day of April, 2011.

7

8

9    _____

10                    Mary H. Murguia
                      United States District Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 32 -